IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMAS HAYWOOD,                           )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )   C.A. No. 18-610 (MN)
                                          )
ANDREW M. SAUL, Commissioner of           )
Social Security Administration,           )
                                          )
                    Defendant.[1]         )


## MEMORANDUM OPINION


Thomas Haywood, Dover, Delaware; Pro Se Plaintiff.

Eric P. Kressman, Regional Counsel, and Eda Giusti, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania; David C. Weiss, United States Attorney for the District of Delaware, Wilmington, Delaware; Gregg W. Marsano, Special Assistant United States Attorney, and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, Pennsylvania, Attorneys for Defendant.


September 6, 2019
Wilmington, Delaware

---

[1]     Andrew Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted for Nancy A. Berryhill, Acting Commissioner of Social Security who was named as the defendant in this suit.



NOREIKA, U.S. DISTRICT JUDGE:

Plaintiff Thomas Haywood ("Haywood" or Plaintiff"), who appears *pro se*, appeals the decision of Defendant Andrew M. Saul, Commissioner of Social Security ("the Commissioner" or "Defendant"), denying his applications for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") benefits under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 401-434, 1381-1383f. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are Plaintiff's motion for summary judgment and Defendant's cross motion for summary judgment. (D.I. 12, 14). Plaintiff requests "any relief that Your Honor may provide." (D.I. 12 at 3). The Commissioner requests that the Court affirm the decision denying Plaintiff's claim for benefits. (D.I. 15 at 16). For the reasons stated below, the Court will deny Plaintiff's motion and will grant Defendant's cross-motion for summary judgment.

## I. BACKGROUND

### A. Procedural History

On November 17, 2014, Plaintiff filed for DIB and SSI, alleging disability beginning October 15, 2014[2] due to back, neck, and shoulder injury complaints, cognition problems from a traumatic brain injury ("TBI") that had occurred on March 8, 2010, and major depression.[3] (D.I. 9-5 at 2-5). Plaintiff's application was denied initially on January 13, 2015, and upon reconsideration on July 2, 2015. (D.I. 9-4 at 3-8, 17-22). He requested an administrative hearing

---

[2]      Plaintiff initially alleged an onset date of March 8, 2010, but amended the onset date to October 15, 2014. (D.I. 9-2 at 14).

[3]      For DIB purposes, Plaintiff was forty-seven years old on the date his insured status expired, and thus considered a younger person as defined under 20 C.F.R. §§ 404.1563(c), 416.963(c). (D.I. 9-2 at 27).

before an Administrative Law Judge ("ALJ"), and it was held on March 21, 2017. (D.I. 9-2 at 38-83; D.I. 9-4 at 202-03). Plaintiff, who was represented by counsel, provided testimony as did vocational expert ("VE") Helen Tucker. The ALJ issued a decision on May 3, 2017, finding that Plaintiff was not disabled. (D.I. 9-2 at 14-34). Plaintiff sought review by the Appeals Council, submitted additional evidence, and his request was denied on March 13, 2018, making the ALJ's decision the final decision of the Commissioner. (D.I. 9-2 at 79-82, D.I. 9-4 at 79-82). On April 23, 2018, Plaintiff, appearing *pro se*, filed this action seeking review of the final decision. (D.I. 2).

### B. Factual History

#### 1. Disability Report – November 17, 2014 (Form SSA-3368)

In his disability report dated November 17, 2014 (Form SSA-3368) (D.I. 9-6 at 17-28), Plaintiff asserted that he has the following physical or mental conditions that limit his ability to work: back injury, neck injury, diplopia, shoulder injury, short-term memory issues and cognition problems from a March 8, 2010 TBI, major depression, chronic low back pain from stenosis, facet joint arthritis, and disc degeneration. (*Id.* at 18). He indicates that he stopped working on December 31, 2009 because the "business closed" and that as of March 8, 2010, his "condition[s] became severe enough to keep [him] from working." (*Id.*). Plaintiff lists the following medications on his disability report: aspirin (thin blood heart attack in 2007), Crestor (cholesterol), Cymbalta, Lisinopril (blood pressure), Toprol (blood pressure), and Tramadol (pain relief); the medications prescribed by Southside Family Practice, Alpha Behavioral Health, Delaware Cardiovascular Associates, and Christiana Care Health System. (*Id.* at 21). On July 29, 2016, Plaintiff updated his medication list and added: Metformin (diabetes), Atorvastatin (cholesterol), Metoprolol Succinate ET (blood pressure/heart), morphine sulfate (pain), and a multi-vitamin; the

medications prescribed by Family Nurse Practitioner Olasumbo T. Afilaka ("Afilaka"), Dr. Khaled El Jazzar ("Dr. El Jazzar"), and Dr. Howard Arian ("Dr. Arian"). (*Id*. at 71).

Plaintiff lists the following providers as having medical records about his physical and mental conditions: Alpha Behavioral Health, Dr. Lyndon Cagampan ("Dr. Cagampan") of Delaware Back Pain & Sports, CM-MRI, Southside Family Practice, Dr. David Long ("Dr. Long") of Bryn Mawr Rehab Hospital, Christiana Care Health System, Dr. El Jazzar of Delaware Cardiovascular Associates, and Dynamic Physical Therapy. (*Id*. at 21-27). On July 29, 2016, Plaintiff updated the medical provider list and added Dr. Robert Varipapa ("Dr. Varipapa"), Dr. Arian, Nurse Practitioner Afilaka, Doctor of Podiatric Medicine Jacob Hanlon ("Dr. Hanlon"), Dr. Gerard Stroup ("Dr. Stroup") of Burke Dermatology, and Dr. Christopher Vallorosi ("Dr. Vallorosi") of Urology Associates. (*Id*. at 70).

### 2. Disability Reports – Appeal (Form SSA-3441)

In his January 29, 2015 appeal disability report (D.I. 9-6 at 53-58), Plaintiff indicates that there have been no changes in his illnesses, injuries, or conditions, and he has no new physical or mental limitations as a result of his illnesses, injuries, or conditions. (*Id*. at 53). The medical providers listed are Dr. Arian of Southern Delaware Pain Management, Alpha Behavioral Health, and Dynamic Physical Therapy and no medications are listed. (*Id*. at 54-56).

In his August 10, 2015 appeal disability report (*id*. at 63-68), Plaintiff indicates that there have been no changes in his illnesses, injuries, or conditions, and he has no new physical or mental limitations as a result of his illnesses, injuries, or conditions. (*Id*. at 64). The report does not list any medical providers or medications. (*Id*. at 63-68).

### 3. Pain Questionnaire

In his December 16, 2014 pain questionnaire, Plaintiff states that he has near constant aching pain in the low back with occasional sharpening and pulsating. (D.I. 9-6 at 51). Both shoulders wake him during the night with pain and he has frequent neck pain. (*Id*.). Plaintiff states that the pain worsens with movement, cold or wet weather, sitting too long, or being on his feet too long. (*Id*.). Plaintiff states that he experiences pain throughout the day, it lasts throughout the day, and is usually worse in the evening. (*Id*.). Plaintiff states that the pain worsened over the past 12 months. (*Id*.).

He reported taking Tramadol and methadone three times per day with minimal effectiveness. (*Id*.). Treatment used to relieve the pain includes physical therapy that helps strength and range of motion, but there is increased pain while doing the therapy. (*Id*.). Hot showers and a heating pad help minimally, and lying down also helps. (*Id*.)

The report states that Plaintiff is involved in rehabilitation with the goal of returning to work part time. (*Id*.). Plaintiff reports that all activities were restricted or stopped because of the pain and, when sleeping, he awakens after a few hours due to pain in the back and shoulders. (*Id*. at 52).

### 4. Medical History, Treatment, and Conditions

The Court has reviewed all medical records submitted. For purposes of this appeal, the relevant medical history begins in March 19, 2010 and continues through March 2, 2017. (D.I. 9-8 through D.I. 9-27 at Exs. B1F-B21F).

### a. Physical Conditions, Providers, and Treatment

Plaintiff had a myocardial infarction in 2007 at age 39. (D.I. 9-19 at 53). Plaintiff was injured in motor vehicle accident on March 8, 2010, and suffered a TBI, followed by rehabilitation

at Bryn Mawr Rehabilitation Hospital through early April 2010. (D.I. 9-8 at 2-81; D.I. 9-9 at 2-42). An electroencephalogram performed in May 2012 revealed borderline background frequencies suggesting the presence of a mild generalized cortical disturbance. (D.I. 9-23 at 45).

Plaintiff was treated by Dr. Cagampan for neck pain, low back pain, and shoulder pain in September and October 2014. (D.I. 9-15 at 42-45). In October 2014, Plaintiff described the pain as constant and moderate and a five out of ten. (D.I. 9-15 at 42; D.I. 9-22 at 64-65). The October 2014 treatment note states that Plaintiff violated his narcotic contract by smoking marijuana while taking Tramadol, that Dr. Cagampan advised Plaintiff he would no longer prescribe Plaintiff controlled substances, and that Plaintiff was not happy about this. (D.I. 9-15 at 45). On November 4, 2014, Dr. Cagampan advised Plaintiff that he could no longer provide him with medical care. (*Id*. at 50).

Plaintiff received physical therapy for complaints of low back pain between July 2014 and October 2014. (D.I. 9-11 at 101-110; D.I. 9-12 at 2-29). At his physical therapy session on October 15, 2014, Plaintiff had fair tolerance to treatment, and he demonstrated minimal progress as to pain levels and functional activity performance. (D.I. 9-12 at 27). Plaintiff stated that he was transitioning to another medical doctor, wished to discontinue physical therapy, and he was discharged per his request. (*Id*.).

Plaintiff also received physical therapy between July 2014 and October 2014 for joint pain in the left shoulder. (*Id*. at 30-57). He reported increased pain with overhead movements and intermittent pain, a pain level of two at best and seven at worst. (*Id*. at 30). When Plaintiff presented for his physical therapy appointment on October 1, 2014, he reported that his shoulder was "not bothering him that much today." (*Id*. at 55). The notes for October 1, 2014 state that Plaintiff had demonstrated progress by increased range of motion and muscle strength, and an

improved quick dash score that indicated improved functional activity tolerance.  (*Id.* at 56).  Plaintiff was discharged as a patient per his request.  (*Id.*).

On October 15, 2014, an MRI was taken of Plaintiff's lumbar spine.  (D.I. 9-22 at 63).  The clinical indication was chronic low back pain and pain down both legs, getting worse.  (*Id.*).  The MRI showed transitional lumbosacral vertebral anatomy with the lowermost independent vertebral body designated as a partially lumbarized S1 with otherwise normal alignment, height, contour, and bone marrow signal of the visualized vertebral bodies.  (*Id.*).  It also showed multilevel spondyloarthropathy, worse at L5-S1 where it resulted in bilateral moderate to severe foraminal stenosis, greater on the left with likely impingement of the exiting left L5 nerve root, and no focal disc herniation or vertebral malalignment.  (*Id.*).

Lawrence Piccioni, M.D. ("Dr. Piccioni") treated Plaintiff for upper extremity complaints including impingement and rotator cuff tear of the right shoulder, lateral epicondylitis of the right elbow, and adhesive capsulitis of the left shoulder.  (D.I. 9-19 at 60).  Dr. Piccioni's December 23, 2014 medical report states that Plaintiff "has treatable medical conditions which are under control," and that he saw "no significant medical reason for certain restrictions and certainly no reason for total disability."  (*Id.*).

Plaintiff returned to physical therapy for his chronic back pain and received therapy between December 2014 and February 2015.  (D.I. 9-12 at 58-66; D.I. 9-20 at 2-50).  On December 10, 2014, he reported that he sometimes experiences pulsating pain aggravated by prolonged standing, walking, and sitting.  (D.I. 9-12 at 48).  When seen on February 18, 2015, Plaintiff continued to complain of back pain when standing too long.  (D.I. 9-20 at 47).  The assessment that day was that Plaintiff had no complaints that any specific exercise caused pain or was challenging to perform during the session.  (*Id.*).

Plaintiff presented at Westside Family Healthcare for routine treatment from October 2014 to April 2015 for diabetes, chronic back pain, frequent urination, hip pain. (D.I. 9-20 at 55-78). Around the same time, between November 2014 and April 2015, Plaintiff was seen by Dr. Arian, a pain management physician for his low back pain. (D.I. 9-21 at 2-89). Dr. Arian prescribed medication for chronic pain and counseled Plaintiff about physical therapy compliance. (*Id*. at 6-7, 30-33). Plaintiff continued pain management treatment with Dr. Arian between May 19, 2015 and September 9, 2016 for back pain and diabetic peripheral neuropathy complaints. (D.I. 9-24 at 24-52, 56-69; D.I. 9-25 at 2-114). As of September 2016, Plaintiff continued with pain medication and physical therapy. (D.I. 9-24 at 25-27).

Plaintiff continued with routine treatment at Westside Family Healthcare from November 2015 through September 2016, including treatment for his diabetes, heel pain, and urinary urgency. (D.I. 9-24 at 2-14). On March 9, 2016 Plaintiff was seen at Delaware Podiatric Medicine for a consult. (*Id.* at 53-55). He was assessed a having painful plantar fasciitis of the right foot, prescribed an ankle foot brace to be used for sixty days, and advised to receive physical therapy. (*Id.*). Plaintiff received physical therapy beginning August 18, 2016 through October 26, 2016 for right plantar fasciitis. (D.I. 9-26 at 2-55; D.I. 9-27 at 2). Plaintiff was discharged on October 26, 2016, as independent with a home exercise program, and he had met the maximum benefit from the physical therapy. (D.I. 9-26 at 52).

Plaintiff was seen by Dr. Varipapa on June 16, 2016, for a follow-up of cognitive difficulties and memory loss from his prior appointment on December 4, 2013. (D.I. 9-23 at 58). Plaintiff provided a history of difficulties, including the ability to stay focused, concentrate, maintain an appropriate mood, remain alert, remember things he used to know, and retain short-term memories. (*Id.*). Plaintiff reported that his symptoms were unchanged since the last office

visit in 2013.  (*Id.*).  Plaintiff reported infrequent and mild headaches.  (*Id.*).  When Plaintiff

was seen by Dr. Varipapa on July 13, 2016, he stated that he was able to attend to his activities of

daily living, do lawn work, and laundry.  (*Id.* at 65).  Plaintiff reported that his headaches were

rare, and he could not recall when the last one occurred.  (*Id.*).  The assessment was depression

and cognitive and neurobehavioral dysfunction following brain injury.  (*Id.* at 68).

Plaintiff continued with cardiac care.  A myocardial perfusion study was performed on

June 20, 2015 showed no evidence of ischemia or tear, and a normal ejection fraction.  (D.I. 9-27

at 28).  When Plaintiff was seen by cardiologist Dr. El Jazzar on May 24, 2016, Plaintiff stated

that he had rare episodes of chest pain that had resolved since his last visit.  (*Id.* at 12).  During

his November 2016 visit with Dr. El Jazzar, Plaintiff told the cardiologist that he had minimal

chest pain, very rare, and it resolves quickly.  (*Id.* at 6).  Plaintiff's records from Westside Family

Healthcare during February 2014, and June and September 2016, indicate that Plaintiff denied

chest pain, edema, or shortness of breath, and examination revealed that Plaintiff had normal heart

sounds, regular rate and rhythm, and no murmurs, rubs, or gallops.    (D.I. 9-20 at 12-14, D.I. 9-

24 at 4, 7).

### b.    Mental Conditions, Providers, and Treatment

From September 2014 through March 2017, Plaintiff received regular therapy for

depression from Alpha Behavioral Health.  (D.I. 9-27 at 60-78).  Plaintiff reported that he was

not taking medication because of commercials he had seen.  (*Id.* at 61).  Many of Plaintiff's

complaints concerned being a burden on his mother, conflicts with family members, and his pursuit

of Social Security disability benefits.  (*Id.* at 68-74).

Janis Chester, M.D. ("Dr. Chester") conducted a mental health evaluation of Plaintiff on

June 15, 2015.  (D.I. 9-23 at 22).  Dr. Chester described Plaintiff as a "fair historian" who

provided his medical history and reported that he had received therapy for approximately one year, every 7 to 14 days. (*Id*.). Upon mental status examination Plaintiff was alert and oriented in all spheres, he had no delusions, his thought process was circumstantial and occasionally tangential, his concentration was intact, his immediate memory was intact, short term memory spontaneously intact and improved with prompting, and his long term memory intact except for recalling details of the March 2010 motor vehicle accident. (*Id*. at 24). Plaintiff's insight and judgement were fair. (*Id*.) Plaintiff was diagnosed with depression secondary to chronic pain, and marijuana abuse. (*Id*. at 24).

Dr. Chester completed a residual functional capacity questionnaire and determined that Plaintiff had a "mild" impairment (*i.e*., suspected impairment of slight importance which does not affect ability to function) or "moderate" impairment (*i.e*., impairment which affects but does not preclude ability to function) in all work-related activities, except for a "moderately severe" impairment (*i.e*., impairment which seriously affects ability to function) in the area of performing work requiring frequent contact with others. (D.I. 9-23 at 16-17).

In January 2016, Plaintiff's therapist at Alpha Behavioral Health advised Plaintiff to research part-time employment. (*Id*. at 72). In September 2016, Plaintiff increased his sessions from a bi-weekly schedule to a weekly schedule. (*Id*. at 75). In February 2017, Plaintiff's therapist recommended that Plaintiff engage in volunteer work, but Plaintiff reported having pain 24 hours a day. (*Id*. at 77).

On February 14, 2017, Plaintiff's therapist, Allen Harris ("Harris") completed a mental medical source check-off form and concluded that Plaintiff had a "mild" limitation (*i.e*., slight) or a "moderate" limitation (*i.e*., functioning in the area independently, appropriately, effectively, and on a sustained basis is "fair") in all mental work-related areas, with the exception that Plaintiff had

"marked" limitations (*i.e.*, functioning in the area independently, appropriately, effectively, and on a sustained basis is "seriously limited") in the ability to make simple work-related decisions and the ability to accept instructions and respond appropriately to criticism from supervisors. (*Id*. at 57-59).

### c.    State Agency Consultants

On January 8, 2015, Vinod K. Kataria, M.D. ("Dr. Kataria"), a state agency physician, determined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for 4 hours, sit for 6 hours in an 8-hour day, and is limited to occasional climbing of ramps/stair, ladder, ropes, scaffolds, frequent balancing, stooping, kneeling, crouching, and crawling. (D.I. 9-3 at 10-11). On May 20, 2015, Darrin Campo, M.D. ("Dr. Campo"), a state agency physician, reviewed Plaintiff's claim and affirmed Dr. Kataria's determination. (*Id*. at 45).

Carlene Tucker-Okine, Ph.D. ("Dr. Tucker-Okine"), a state agency psychologist, conducted a psychiatric review on January 12, 2015. (D.I. 9-3 at 8-15). Dr. Tucker-Okine opined that Plaintiff has the mental residual functional capacity to perform routine tasks. (*Id*. at 15). On July 1, 2015, Pauline Hightower, Ph.D. ("Dr. Hightower"), a state agency psychologist, reviewed Plaintiff's claim, reaffirmed the conclusions of Dr. Tucker-Okine, and opined that Plaintiff could understand, retain, and carry out simple/repetitive instructions; perform routine tasks on a sustained basis, with moderate limits with supervision; cooperate with co-workers in completing simple/repetitive tasks and transactions; and adjust to modest mental demands of the workplace. (*Id*. at 47-53).

### 5. The Administrative Hearing

#### a. Plaintiff's Testimony

Plaintiff worked for a small carpet business from 1998 to 2009 as a warehouseman, sales associate, and store manager. (D.I. 9-2 at 67-68). Plaintiff lives with his mother. (*Id*. at 44). He performs chores such as using a riding lawn mower to mow the lawn, caring for the dog, rinsing dishes and loading the dishwasher, and doing laundry. (*Id*. at 45, 60, 62, 63). He occasionally drives and travels mostly to the library and the pharmacy and goes to the grocery store. (*Id*. at 51-52). He does not read much and watches some television. (*Id.* at 59).

Plaintiff had a heart attack ten years ago and takes cholesterol and blood pressure medication. (*Id*. at 53-54). He testified to regular chest pain but it "isn't that bad." (*Id*. at 54).

Plaintiff testified that for more than 20 years he has had chronic low back pain in the tailbone area and sometimes on both sides. (*Id*. at 46, 49). He has used a back brace and a TENS unit. (*Id*. at 61). His neck bothers him, but it is not constant. (*Id*. at 53). He uses a cane to assist him in getting around and when he has to do any amount of walking, but it was not prescribed by a physician. (*Id*. at 47-48).

Plaintiff also has shoulder pain in both shoulders on a daily basis. (*Id*. at 50). He can reach in front of him, but it is painful to reach overhead. (*Id*.). He can brush and wash his hair and lift grocery bags. (*Id*. at 51). He can lift 20 pounds, but not repetitively. (*Id*.)

Plaintiff also has pain in both feet. (*Id*. at 52). Plaintiff testified that he believed the pain was diabetes related and that he also had a bone spur. (*Id*.) A physician prescribed an ankle and foot brace, but Plaintiff does not wear it regularly. (*Id.* at 61).

Plaintiff testified that he was on pain medication for 20 years, but at the time of the hearing he was not on any pain medication because the facility that treated him (*i.e.*, Southern Delaware

Pain Management) went out of business. (*Id.* at 41, 50, 69). For pain relief, Southern Delaware Pain Management prescribed methadone, oxycontin, and morphine. (*Id.* at 69-70). He testified the medication provided limited relief. (*Id.* at 56). Cold and wet worsens the pain. (*Id.* at 56). Lying down gives him the most pain relief. (*Id.* at 57). When available, he uses marijuana for pain relief. (*Id.* at 63-64).

Plaintiff does not sleep well due to pain, frequent urination, and diabetes. (*Id.* at 58). He testified that the lack of sleep affects him and he is "not fit to be around other people most times." (*Id.*). He is irritable because of his pain level, and his ability to concentrate is very bad. (*Id.* at 59). It is hard for him to have a conversation due to his traumatic brain injury. (*Id.* at 47, 59). He forgets, and it is hard for him to stay focused. (*Id.* at 59). The combination of pain and memory problems causes him to take longer to complete tasks. (*Id.* at 60). He carries a small notebook to help him remember things. (*Id.* at 65).

Plaintiff testified that it is difficult to bend over and pick something up off the ground – he can get down but there is increased pain. (*Id.* at 54-55). He cannot kneel, and he uses chair arms or a cane to help him get out of a chair. (*Id.* at 55). He can manage stairs so long as there is something for him to hold on to, but he cannot crawl or crouch and would not attempt to climb a ladder. (*Id.* at 55-56). He can walk a quarter to half a mile. (*Id.* at 56). He can stand for 15 to 30 minutes. (*Id.* at 57). His foot and back pain preclude him from standing any longer. (*Id.*). He can sit for 30 to 60 minutes. (*Id.*).

Plaintiff is able to dress himself, but there is some difficulty. (*Id.* at 61). He is able to take care of his personal hygiene but it is more difficult than it used to be. (*Id.* at 61-62).

### b.      Vocational Expert's Testimony

A VE testified at the administrative hearing.   (D.I. 9-2 at 72-83).   The ALJ asked the VE whether an individual could perform his past relevant work assuming an individual of Plaintiff's age, education, and work experience; who was restricted to light work and limited to occasional climbing, stooping, kneeling, crouching, and crawling; restricted to simple, routine, and repetitive tasks; and with only brief superficial interaction with the public and co-workers.   (*Id.* at 72-73). The VE replied that "past work would be eliminated."   (*Id*. at 73).

The VE testified that an individual with the described limitations could perform work as an inspector hand packager, laundry worker, label coder, and cleaner polisher.   (*Id*. at 73-74). The VE testified that the individual would not be capable of maintaining competitive work if the person was off task over 15 percent of the time due to issues to dealing with memory and concentration.   (*Id*. at 75).

### C.      The ALJ's Findings

On May 3, 2017, the ALJ issued the following findings (D.I. 9-2 at 14-29):

1.      The claimant met the insured status requirements of the Social Security Act through December 31, 2014.

2.      The claimant has not engaged in substantial gainful activity since October 15, 2014, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).[4]

3.      The claimant has the following severe impairments:   coronary artery disease status-post myocardial infarction; post-concussion syndrome status-post traumatic brain injury; headaches; pain disorder; plantar fasciitis, right foot; degenerative disc disease of the lumbar spine (20 CFR 404.1520(c) and 416.920(c)).[5]

---

[4]      A review of Plaintiff's earnings revealed that he had not worked since before his amended onset date.   (D.I. 9-2 at 15).

[5]      While Paragraph 3 does not list Plaintiff's mental impairment as a severe impairment, the ALJ clearly considered Plaintiff's mental condition as is evidenced by his review of the medical records, his thorough analysis of Plaintiff's mental condition, and his use of the required steps in the disability determination process.   (D.I. 9-2 at 18-19).

4.  The claimant does not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can only stand or walk four hours total during an eight-hour workday; he can only occasionally climb, stoop, kneel, crouch, and crawl; he is limited to simple, routine, and repetitive tasks; he can have only brief and superficial contact with the public or with coworkers.[6]

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on February 20, 1967 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

---

[6]  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, it is determined that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.   20 C.F.R, §§ 404.1567(a), 416.967(b).

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.   20 C.F.R, §§ 404.1567(a), 416.967(a).

economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g).

## II.     LEGAL STANDARDS

### A.     Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.   *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).   A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R. Civ. P. 56(c)(1)(A) & (B).   If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."   *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).   The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."   *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S.

at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**B.      Review of the ALJ's Findings**

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). Evidence that was not submitted to the ALJ can be considered, however, by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has made clear that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (*e.g.*, that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## III.    DISCUSSION

### A.    Disability Determination Process

A "disability" is defined for purposes of DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Hess v. Commissioner of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity); *Hess*, 931 F.3d at 201. If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *Id.* If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (20 C.F.R § 404.1520, Subpart P, Appendix 1) that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *Id.* If a claimant's impairment,

either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Hess*, 931 F.3d at 201.

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Zirnsak*, 777 F.3d at 611. A claimant's RFC "is the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1); *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. § 404.1545(a)(1)). "[T]he claimant always bears the burden of establishing (1) that []he is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents [him] from performing [his] past work." *Zirnsak*, 777 F.3d at 611 (quoting *Wallace v. Secretary of Health & Human Servs*., 722 F.2d 1150, 1153 (3d Cir. 1983). If the claimant cannot perform his past relevant work, the ALJ moves on to step five. *Hess*, 931 F.3d at 202.

At step five, the ALJ examines whether the claimant "can make an adjustment to other work[,]" considering his "[RFC,] . . . age, education, and work experience[.]" 20 C.F.R. §§ 404.1520(a)(4)(v) and (g), 20 C.F.R. 416.920(a)(4)(v) and (g); *Hess*, 931 F.3d at 202. That examination typically involves "one or more hypothetical questions posed by the ALJ to [a] vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). If the claimant can make an adjustment to other work, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot, he is disabled.

At this last step, ". . . the Commissioner bears the burden of establishing the existence of other available work that the claimant is capable of performing." *Zirnsak*, 777 F.3d at 612 (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)). In other words, the Commissioner ". . . is

responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [their] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). "'Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy.'" *Zirnsak*, 777 F.3d 612 (quoting *Provenzano v. Commissioner,* Civil No. 10-4460 (JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011)).

When mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis and an ALJ assesses mental impairments. 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *Hess*, 931 F.3d at 202. As part of step two of the disability analysis, the ALJ decides whether the claimant has any "medically determinable mental impairment(s)." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (providing that, at step two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment"); *Hess*, 931 F.3d at 202. "[A]s part of that same step and also step three of the disability analysis, the ALJ determines 'the degree of functional limitation resulting from the impairment(s)[.]'" *Id.* (quoting 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2) and citing 20 C.F.R. §§ 404.1520a(d), 416.920a(d), 404.1520(a)(4)(ii)-(iii), 416.920(a)(4)(ii)-(iii) (explaining that the ALJ uses "the degree of functional limitation" in assessing "the severity of [the claimant's] mental impairment(s)[,]" which is considered at steps two and three)).

In determining the degree of functional limitation, the ALJ considers "four broad functional areas . . . : Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *Hess*, 931 F.3d at 202. The first three areas are rated on a "five-point scale: None, mild, moderate, marked, and

extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4); *Hess*, 931 F.3d at 202. The fourth is rated on a scale of: "None, one or two, three, four or more." *Id.*

"The ALJ uses that degree rating in 'determin[ing] the severity of [the] mental impairment(s)[,]' which is considered at steps two and three." *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(d), 416.920a(d) and citing 20 C.F.R. §§ 404.1520(a)(4)(ii)-(iii), 416.920(a)(4)(ii)-(iii) (stating that, at steps two and three, the ALJ "consider[s] the medical severity of [the claimant's] impairment(s)"). "If . . . the degree of [the claimant's] limitation in the first three functional areas [is] 'none' or 'mild' and 'none' in the fourth area, [the ALJ] will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [his] ability to do basic work activities." *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) (citation omitted)).

"At step three, if the ALJ has found that a mental impairment is severe, he "then determine[s] if it meets or is equivalent in severity to a listed mental disorder." *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2) and citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (explaining that, at step three, the ALJ determines whether the claimant has "an impairment(s) that meets or equals" a listed impairment). "That analysis is done 'by comparing the medical findings about [the claimant's] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder.'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2)). As explained by the Third Circuit, "the claimant may have the equivalent of a listed impairment if, *inter alia*, he has at least two of '1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining

concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1).

"[T]o complete steps four and five of the disability analysis, if the ALJ has found that the claimant does not have a listed impairment or its equivalent, the ALJ 'will then assess [the claimant's mental RFC].'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3) and citing 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v) (providing that, at steps four and five, the ALJ considers the claimant's RFC)).

## B.    Issues Raised on Appeal

On appeal, Plaintiff raises two claims to support a finding of disability:[7]    (1) the ALJ made a mistake in finding Plaintiff not disabled "due to a lack of full and complete understanding;" and (2) Plaintiff's attorney, whom he met the day of the hearing, was responsible for the not disabled determination.   (D.I. 12 at 3).   On appeal, Defendant raises the claim that substantial evidence supports the ALJ's finding that Plaintiff is not disabled.   (D.I. 15 at 12).

## C.    The ALJ's Finding as to Plaintiff's Physical and Mental Limitations

Plaintiff argues that the finding of not disabled is due to the ALJ's lack of understanding of his condition.   The Commissioner argues that substantial evidence supports the ALJ's decision that Plaintiff was not disabled under the Act.   The Commissioner argues that the ALJ properly followed the five-step sequential analysis process outlined in the Social Security Regulations, the ALJ considered all the evidence, sought testimony from a VE, and relied upon that testimony in

---

[7]    Plaintiff filed his Complaint *pro se*.   Therefore, the Court must liberally construe his pleadings, and "apply the applicable law, irrespective of whether he has mentioned it by name." *Holley v. Department of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999); *see also Leventry v. Astrue*, Civ.A. No. 08-85J, 2009 WL 3045675 (W.D. Pa. Sept. 22, 2009) (applying same in the context of a social security appeal).

finding that Plaintiff is capable of performing a significant number of jobs in the national economy which constitutes substantial evidence of non-disability.

The final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner. *See Breen v. Commissioner of Soc. Sec.*, 504 F. App'x 96 (3d Cir. 2012) (citing 20 C.F.R § 404.1546(c)). Here, the ALJ considered the effects of Plaintiff's condition in relation to his ability to perform work. It is evident from the ALJ's decision that he thoroughly reviewed and considered the medical records submitted.

### 1.    Physical Limitations

The ALJ found that Plaintiff had multiple severe impairments including coronary artery disease status-post myocardial infarction; post-concussion syndrome status-post traumatic brain injury; headaches; pain disorder; plantar fasciitis, right foot; degenerative disc disease of the lumbar spine, all diagnosed by numerous physicians. (D.I. 9-2 at 16). The ALJ considered Plaintiff's hypertension, hyperlipidemia, status-post right shoulder rotator cuff repair, and marijuana abuse, finding them non-severe. (*Id*. at 17). He also considered whether Plaintiff's coronary artery disease, post-concussive syndrome, headaches, lumbar degenerative disc disease, and mental impairment met any of the listing requirements, and found they did not. (*Id*. at 17-18).

With regard to Plaintiff's physical impairments and physical complaints, the ALJ considered the treatment and medical records to support his findings noting Plaintiff's:  (1)   heart condition – referring to many normal findings and improved chest pain; (2) diabetes – noting it was well-controlled; (3) plantar fasciitis – noting that the condition improved with physical therapy; (4) headaches and post-concussion syndrome – noting that the headaches were fairly controlled, neurological exams revealed normal findings, neurocognitive scores ranged from low

to average and that as of July 2016, plaintiff has poor reaction time and memory span, but good memory function; and (5) back pain – noting that Plaintiff consistently had normal strength, reflexes, and sensations with negative straight-leg raising, surgical intervention was never recommended to treat Plaintiff's degenerative disc disease, and he had varying complaints of pain upon examination and sometimes had only minimal pain.   (D.I. 9-2 at 21-23, 26-27).

## 2. Pain

In addition, the ALJ properly considered allegations of pain.   Social Security Regulations provide that, in determining whether a claimant is disabled, the ALJ must consider all of a claimant's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a).   A claimant's subjective complaints of symptoms alone are not sufficient to establish disability. *See id.*   In evaluating a claimant's subjective complaints, the ALJ must consider, first, whether the claimant has a medically determinable impairment that could reasonably be expected to produce the symptoms she alleges.   *See* 20 C.F.R. §§ 404.1529(b), 416.929(b).   Once an impairment is found, the ALJ must then evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit his ability to work.   *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii) (factors relevant to symptoms can include daily activities and medical treatment).   After an ALJ has evaluated a claimant's credibility, that determination is entitled to due deference because of the ALJ's opportunity to observe the claimant and weigh the claimant's testimony against the medical record.   *See Wier v. Heckler*, 734 F.2d 955, 961-62 (3d Cir. 1984).   A credibility determination by an ALJ should not be reversed unless it is "inherently incredible or patently unreasonable."   *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718-19 (3d Cir. 2001) (internal quotation omitted).

As discussed above, the ALJ concluded that Plaintiff had several severe impairments and found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (D.I. 9-2 at 21). However, after examining Plaintiff's subjective complaints and the other evidence of record, the ALJ ultimately determined the evidence did not fully support that Plaintiff's impairments were as severe as alleged and caused no more limitations that those contained in the RFC. (Id. at 27). The ALJ also explained that the record showed that although Plaintiff frequently complained of pain, he was consistently found to be in no acute distress upon exam and, at times, Plaintiff had only mild back pain and sometimes described it as intermittent. (*Id.*). Also, the ALJ noted that Plaintiff was independent with his activities of daily living, but needed increased time to complete them. (*Id.* at 21). Finally, the ALJ did not entirely discount Plaintiff's allegations of pain in his decision; rather, he appropriately found that Plaintiff suffered from pain, but still retained the capacity for light work with additional restrictions. *See*, *e.g.*, *Andreolli v. Commissioner of Soc. Sec.*, No. 07-1632, 2008 WL 5210682, at *4 (W.D. Pa. Dec. 11, 2008) (noting that "a claimant need not be pain-free or experiencing no discomfort in order to be found not disabled").

### 3. Physical RFC

The medical opinions of record support the ALJ's residual functional capacity assessment. Dr. Piccioni, who treated Plaintiff for his upper extremity complaints, opined in December 2014 that Plaintiff "has treatable medical conditions which are under control." In addition, state agency physicians opined that Plaintiff had the physical residual functional capacity to perform light work consistent with the ALJ's residual functional capacity assessment.

### 4. Mental Condition

With regard to mental impairment, the ALJ considered the impairment singly, and in combination, and determined at step three that Plaintiff's impairments failed to meet or medically equal any of the Listings. (*See* D.I. 19-2 at 18-19; *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990)) (The Listings define impairments that would prevent an adult from performing any gainful activity, not just substantial gainful activity).

The ALJ considered Plaintiff's mental impairments under Listings 12.02, neurocognitive disorder and 12.04, affective disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04. Under both listings, a claimant must satisfy the criteria outlined in paragraphs A and B or paragraphs A and C. *See id.* Paragraph A criteria relate to medical findings; Paragraph B criteria relate to impairment-related functional limitations; Paragraph C criteria relate to additional functional limitations.

As the ALJ explained in his analysis, in order to satisfy the paragraph B criteria of Listing 12.02 and 12.04, Plaintiff's impairments had to result in at least two of four of the following limitations: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (D.I. 9-2 at 18). The ALJ thoroughly addressed each of the above elements, adequately discussed Plaintiff's various symptoms and his treatment, and ultimately found that the above-stated requirements were not met or medically equaled, finding his limitations were either mild or moderate. (*Id.* at 18-19).

Because Plaintiff's mental impairments did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation of extended duration, the Court finds that the ALJ appropriately found that the paragraph B criteria of Listing were not satisfied.

The ALJ then considered whether paragraph C criteria were satisfied and found the evidence failed to establish the presence of paragraph C criteria. (*Id*. at 19). The ALJ also noted that no State agency psychological consult concluded that a mental listing was medically equaled. (*Id*.). The ALJ careful considered the evidence, considered the Listings, and gave careful reasoning for his finding at step three of the sequential evaluation process. Notably, while the ALJ found that Plaintiff had the capacity to perform light work, he considered Plaintiff's mental condition and included the limitation that in performing light work, Plaintiff can have only brief and superficial contact with the public or with coworkers.

### 5. Medical Opinions

With regard to medical opinions, an ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec*., 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.").

The ALJ gave some weight to the opinion of Dr. Kataria, explaining that Dr. Kataria's opinion was generally consistent with the objective medical record; some weight to the opinion of Dr. Piccioni, because it was conclusory and did not contain a detailed assessment of Plaintiff's workplace limitations but is supported by his explanation and he is a treating physician; and some weight to the opinion of Dr. Tucker-Okine because Dr. Tucker-Okine is a non-examining source. The ALJ gave significant weight to the opinions of consultative examiner Dr. Chester because her opinion was supported by her findings and Plaintiff's neurocognitive testing.

Finally, the ALJ gave little weight to the opinions of Harris, Plaintiff's therapist, because the Commissioner's regulations provide that medical reports must be submitted by "acceptable

medical sources and Harris' opinion does not qualify as an accepted medical source. *See Harris v. Barnhart*, 65 F. App'x 129, 132 (9th Cir. 2003) (therapist was not a medical doctor and therefore not entitled to deference as an accepted medical source); *Lee v. Sullivan*, 945 F.2d 687, 691 (4th Cir. 1991) (therapist is not an "acceptable medical source" to make a diagnosis or medical assessment of a Social Security claimant's ability to work; his opinion can qualify, at best, as only "a layman's opinion."); *see also Hartranft v. Apfel*, 181 F.3d 358, 462 (3d Cir. 1999) (chiropractor's opinion is not an acceptable medical source opinion entitled to controlling weight).

### 6. Substantial Evidence

Substantial evidence supports the ALJ's finding that Plaintiff has both the physical and mental residual functional capacities to perform the limited range of work identified by the vocational expert. The ALJ considered the medical records as well as the medical opinion evidence and outlined his reasoning in affording weight to the opinions and in determining that Plaintiff has the RFC to perform light work with the added of limitations that he can only stand or walk four hours total during an eight-hour workday; he can only occasionally climb, stoop, kneel, crouch, and crawl; he is limited to simple, routine, and repetitive tasks; he can have only brief and superficial contact with the public or with coworkers. After the VE testified that Plaintiff was unable to perform any past relevant work, the ALJ appropriately relied upon the testimony of the VE in concluding that Plaintiff could perform jobs that exist in significant numbers in the national economy. Accordingly, the Court finds that substantial evidence supports the ALJ's ruling and his evaluation of Plaintiff's residual functional capacity and his determination that he was not disabled.

### D.     Plaintiff's Representation

Plaintiff blames his attorney, whom he met the day of the hearing, for the ALJ's "lack of a full and complete understanding of the situation."   (D.I. 12).   It is not clear what is meant by this; whether counsel made mistakes during the hearing or whether counsel failed to submit evidence. It may be that Plaintiff seeks a Sentence Six remand pursuant to 42 U.S.C. § 405(g) given than he submitted evidence dated August 11, 2011, June 21, 2012, October 11, 2012, March 26, 2014, June 6, 2015, May 31, 2016, and June 8, 2017.  (D.I. 5).   Under Sentence Six, the Court may order a remand based upon evidence submitted after the ALJ's decision, but only if the evidence satisfies three prongs:   (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ.   *Matthews*, 239 F.3d at 593.

Other than the statement referred to, Plaintiff provides nothing to the Court, and there is nothing in the record, that supports Plaintiff's position regarding the representation provided to him.   Nonetheless, to the extent Plaintiff blames counsel for making mistakes during the hearing or for failing to submit additional evidence, this is not considered "good cause" for the purposes of a remand under Sentence Six.   *Taylor v. Commissioner of Social Security*, 43 F. App'x 941, 943 (6th Cir. 2002) ("there is absolutely no statutory or decisional authority for [the plaintiff's] . . . premise that the alleged incompetence of her first attorney constitutes 'good cause' in this context."); *see also Shuter v. Astrue*, 537 F. Supp. 2d 752, 758 (E.D. Pa. 2008) (the claim of attorney error, unsubstantiated and unexplained, did not constitute good cause).

In addition, the evidence submitted does not meet the required three elements for a Sentence Six remand.   First, most of the evidence is not new.   Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990).   After careful review of the proffered

exhibits, it is clear that most existed at the time of the administrative proceeding. Plaintiff filed for benefits on November 17, 2014, and the ALJ did not hold the hearing until March 21, 2017. The only document that is new is the June 8, 2017 health assessment form and it will be discussed below.

The exhibits fail to pass the "materiality" test as well. The evidence must be "relevant and probative" and there must "be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak v. Secretary of Health and Human Servies*, 745 F.2d 831, 833 (3d Cir. 1981). Here, the check-box forms are related to Plaintiff's request for public assistance benefits and to exempt him from participation in employment and training activities. "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). In addition, the June 8, 2017 health assessment form was completed by Nurse Practitioner Afilaka of Westside Family Healthcare. As a nurse practitioner, Afilaka is not an "acceptable medical source" that can "establish . . . a medically determinable impairment." 20 C.F.R. §§ 404.1513(a). Moreover, Plaintiff submitted the June 8, 2017 assessment form to the Appeals Council after the ALJ's decision. (*See* D.I. 9-2 at 76-83; D.I. 9-4 at 79-83). Hence, it was not relied upon by the ALJ in forming his decision. When a claimant seeks to rely on evidence that was not before the ALJ, the District Court may remand "only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ." *Matthews*, 239 F.3d at 593. Finally, Plaintiff provided no explanation, much less good cause, for his failure to present the records he filed in this case. And, as discussed above, to the extent Plaintiff blames counsel for the failure, this is not considered "good cause" for the purposes of a Sentence Six remand.

The Court finds no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).[8]

## IV.    **CONCLUSION**

For the reasons discussed above, the Court will:   (1) deny Plaintiff's motion for summary judgment (D.I. 12); and (2) grant the Commissioner's cross-motion for summary judgment (D.I. 14).

A separate order will be entered.

---

[8]    Plaintiff, however, has the option of filing a new application should he believe the new evidence supports an award for disability insurance benefits.   *See* 20 C.F.R. § 416.330(b).